HORACE WHITE and Others, as Executors, etc., of HENRY VILLARD, Deceased, Appellants, *v.* WILLIAM MOORE ROBINSON and Others, Defendants, Impleaded with WILLIAM L. STOW and Others, Respondents.

First Department, July 7, 1911.

Corporation — release of underwriters from obligation — when underwriters not personally liable to stockholder.

An action for money had and received does not lie against persons who were advertised to have underwritten the stock of a corporation — whether such persons are underwriters strictly speaking or merely subscribers to the capital stock — in favor of a person who bought stock of the company in reliance upon such representation, if the stock purchased was not that of the alleged underwriters, but was unissued stock belong-

ing to the company, and the defendants received no part of the purchase price which went into the treasury of the company, and the representations on which the plaintiff relied were not made by the underwriters themselves, even though the corporation afterwards released the underwriters from some of their obligations and was unsuccessful financially, there being no charge of fraud or misrepresentation on the part of the defendants.

There being no privity between the plaintiff and the alleged underwriters, there was no implied contract on their part to subsequent subscribers that they would do nothing to change the situation by entering into an agreement with the corporation which reduced their liability under the alleged underwriting agreement.

*It seems,* that to hold a subscriber to the capital stock of an unsuccessful corporation liable over to a purchaser upon a public subscription, it is necessary that there should be fraud, misrepresentation or deceit personally brought home to and chargeable against him.

APPEAL by the plaintiffs, Horace White and others, as executors, etc., from a judgment of the Supreme Court in favor of certain of the defendants, entered in the office of the clerk of the county of New York on the 12th day of December, 1908, upon the report of a referee dismissing the complaint upon the merits, except so much of said judgment as dismisses the complaint as to the defendant Camille Weidenfeld.

*George H. Engelhard,* for the appellants.

*Julius F. Workum* of counsel [*Seney Plummer* with him on the brief], *Simpson, Thacher & Bartlett,* attorneys, for the respondent Dickerman.

*Lockwood & Hill,* attorneys for the respondents Benedict and Tag.

*Lorenzo Semple,* attorney for the respondent Fuller.

*Dixon & Holmes,* attorneys for the respondent Stow.

CLARKE, J.:

This action was brought against twenty-six defendants, eight only of whom were served or appeared, of whom two died during the pendency of the case, the action not being revived against their representatives. The complaint was dismissed at the close of the plaintiffs' case by consent as to the defendant

Weidenfeld; and upon the ground that sufficient facts had not been shown to constitute a cause of action as against the defendants Fuller, Benedict, Tag, Stow and Dickerman. Plaintiffs appeal from so much of the judgment as dismisses the complaint against the five defendants last above named.

Plaintiffs are the executors and executrix of the last will and testament of Henry Villard, deceased, who died on November 12, 1900. The complaint alleges, "Upon information and belief, that prior to the 8th day of May, 1899, the defendants entered into an agreement, hereinafter called the underwriting agreement, with one another and with one Ottmar Kern, whereby it was agreed that a company should be incorporated under the laws of the State of New Jersey to be called the Kern Incandescent Gas Light Company," and reciting the terms thereof; "that thereafter, viz., on or about the 8th day of May, 1899, said company was duly incorporated. * * * That * *·* on or about the 23rd day of June, 1899, said defendants offered to one Henry Villard to sell to him at par all or any part of $3,500,000 seven per cent cumulative preferred stock of said company, offering him also one share of common stock for every two shares of preferred stock purchased by him; that at the same time and as an inducement to the acceptance of said offer, they stated to said Henry Villard, among other matters of inducement, that leading financial men in New York and elsewhere had underwritten the said company, agreeing to purchase from said company and pay for the entire capital stock of said company; and that by means of said underwriting said patents had been purchased and ample working capital provided for said company; * * * that said Henry Villard, relying upon said statements of said defendants, and being thereby induced to accept their said offer, did, on or about the first day of July, 1899, purchase from said defendants 250 shares of first preferred and 125 shares of common stock of said company and paid therefor to said defendants the sum of $25,000 according to the terms of their said offer; * * * that at various times prior to the month of July, 1900, said defendants in pursuance of said underwriting agreement paid to said Kern for account of the company and in part

payment of its obligations to said Kern, various sums aggregating $400,000, but that in the month of July, 1900, said defendants refused to pay to said company any further sums on account of said underwriting agreement and agreed among each other and with said Kern to cancel said underwriting agreement and caused said company to release them from all their obligations to it under said agreement, and that neither they nor anyone else on their behalf ever paid any further sum whatsoever to said company or for its account under said underwriting agreement or for its capital stock then remaining unpaid; that by reason of the failure and refusal of the defendants to perform and carry out their said underwriting agreement, and by reason of the cancellation of the same, said company was not provided with any working capital and was totally unable to carry on its business; * * * that on or about January 23rd, 1903, said plaintiffs duly tendered to said defendants due assignments and transfers of said shares of stock and the certificates therefor, and on or about February 26th, 1903, demanded repayment of said sum of $25,000 paid by said Henry Villard for said shares of stock as hereinbefore alleged, but that said defendants have refused to repay said sum to said plaintiffs; that ever since said plaintiffs have been and now are ready and willing at any time to deliver to said defendants due assignments and transfers of said shares of stock and the certificates therefor," and they demanded judgment for $25,000, with interest from the 1st day of July, 1899.

It will be noted that the plaintiffs allege that all of the twenty-six defendants sold the stock to Villard; that there is no allegation of fraud, conspiracy or false representations, nor mutual mistake or failure of considertion; that the alleged tender back of the stock and the demand for the amount paid therefor was three and a half years after the purchase. It is conceded that the statement alleged to have been made by the defendants that leading financial men in New York and elsewhere had underwritten the said company, agreeing to purchase from said company and pay for the entire capital stock of said company, and that by means of said underwriting said patents had been purchased and ample working capital pro-

vided for said company, was true at the time said statement is
alleged to have been made.

The plaintiffs' claim is that the defendants having entered
into the underwriting agreement set up in the complaint, and
having made the statement alleged, and Villard having relied
upon said statement in making his purchase, the defendants
thereby entered into an implied agreement with Villard that
they would do nothing to change the situation as represented;
and when, instead of fully carrying out their underwriting
agreement, they subsequently between themselves and Kern
agreed to cancel and did cancel the sale, Villard and plaintiffs
as his personal representatives had the right to rescind the pur-
chase and to sue and recover from the defendants the amount
paid for the stock as money had and received.

It is to be emphasized that there is no evidence, and no claim
made upon the trial or now, of any fraud, false statements or
misrepresentations; there is no proof that at the time of the
purchase by Villard he had ever seen one of the underwriting
agreements, knew the names of any of the subscribers thereto,
or ever had any personal transactions in regard to this matter
with any one of the defendants.

The basic fact which the plaintiffs must establish is that the
defendants sold their stock to Villard.

In May, 1899, a number of gentlemen signed this paper:
"Kern Incandescent Gas Light Company (Managing under-
writers). It is proposed to organize a corporation under the
laws of the State of New Jersey to be called 'Kern Incandes-
cent Gas Light Company.' * * * The company will be
formed with an authorized capital stock of $12,000,000, of
which $4,000,000 will be preferred 7% cumulative stock and
$8,000,000 common stock. It will purchase from the owner,
Ottmar Kern, the patents covering this light * * * and
will pay therefor the sum of $2,750,000 in cash, $750,000 in
preferred stock, $8,000,000 in the common stock of the company,
which payments shall also include all expenses of organization
and promotion. Subscriptions are invited for $3,250,000 of the
preferred stock. The subscribers to the preferred stock of the
company will receive from the owner of the patents two shares
of the common stock of the company for each share of the pre-

ferred stock allotted to them respectively. When the entire amount of $3,250,000 of the preferred stock offered for subscription is taken at par, there will remain in the treasury of the company for the use of the corporation $500,000 in cash for working capital. The owner of the patents is made a party to this agreement and hereby assents to the delivery of two shares of the common stock for one share of the preferred stock of the company allotted to each subscriber. The subscriptions become binding when the $3,000,000 has been subscribed; ten per cent of subscriptions shall be payable by cheque to the order of Messrs. Coudert Brothers upon their call, and the balance on notice of ten days in writing by the secretary of the company. Stock will be allotted among subscribers when subscriptions are closed, privilege to reduce any subscription being reserved. * * * Subscriptions will not be accepted unless returned to Coudert Brothers, 71 Broadway, who are authorized to arrange for the public subscription to the preferred stock, allowing public subscribers a bonus not to exceed one share of common for each share of preferred."

Other copies of said instrument were signed by other gentlemen wherein the words "who are authorized to arrange for the public subscription to the preferred stock, allowing public subscribers a bonus not to exceed one share of common for each share of preferred" were omitted.

In connection with the so-called managing underwriters' agreement, a separate authorization was signed by about two-thirds of the subscribers as follows: "The undersigned, Subscribers to the managing underwriting of the preferred stock of the Kern Incandescent Gas Light Company, hereby authorize Messrs. Coudert Brothers to make arrangements with any Trust or Banking Company, or Bankers, for the public underwriting to such Preferred Stock, upon such terms and conditions as shall seem best, not exceeding, however, one share of Common Stock for each share of Preferred Stock, as bonus on the public subscription."

Subscriptions were made to the extent of $3,260,000. The company was incorporated on or about the 8th of May, 1899. The company issued to Ottmar Kern $3,500,000 of preferred stock and $8,000,000 of common stock in consideration of the

transfer and delivery by Kern of all patent rights covering the Kern light, and on May 10, 1899, Kern executed and delivered the following paper: " Whereas, Ottmar Kern has heretofore in consideration of the issue and delivery to him of certain stock in the Kern Incandescent Gas Light Company, sold, assigned and transferred to the said Kern Incandescent Gas Light Company, letters patent for certain improvements in incandescent gas burners, together with all further improvements therein and all cognate inventions and all devices and apparatus for perfecting or facilitating the use or application of the invention or inventions aforesaid; and Whereas, The said Kern is desirous of obtaining cash for the stock aforesaid, Now, therefore, in consideration of one dollar to him in hand paid, the receipt whereof is duly acknowledged and of the covenants and agreements hereinafter set forth, the said Kern hereby agrees to and with Coudert Brothers as representatives of the underwriters to a certain subscription paper for the organization of the said Kern Incandescent Gas Light Company to assign, transfer and deliver to the said Coudert Brothers in their capacity aforesaid, 80,000 shares common stock, and 35,000 shares preferred stock of the Kern Incandescent Gas Light Company, upon the following terms: The payment to him by the said underwriters of the sum of $250,000.00 on or before the twenty-second day of May, 1899, and the further payment to him of $2,500,000.00 on or before the fifteenth day of July, 1899. It being, however, expressly stipulated and agreed that the delivery to him of the receipt of William Moore Robinson in person or by attorney for the sum of $1,500,000 or of any portion of such sum shall be equivalent to the payment of the amount in cash for which such receipt shall be given. And in consideration of the premises and of the payments to be made as above, the said Ottmar Kern does hereby covenant and agree to and with Coudert Brothers, as representing the underwriters aforesaid for and on behalf of the corporation, the Kern Incandescent Gas Light Company, that he will at all times upon the request of such corporation, or the duly constituted officers thereof, give to the said corporation such aid, advice, consultation and supervision as may by it be deemed necessary or advisable in the furtherance of the interests of such cor-

poration in connection with any of the inventions conveyed or intended to be conveyed thereto in the assignment by the said Kern bearing even date herewith; it being, however, understood that all and every expense attending and in any way connected with such said consultation or supervision shall be borne by the corporation aforesaid."

It will be seen by comparing the terms of the subscription papers and the paper just set forth that the plan outlined in the subscription agreement was changed in the following respects: The company, instead of paying to Kern $2,750,000 in cash and delivering to him $750,000 in preferred stock, issued to Kern all of its common stock and 35,000 shares of its preferred stock for his patent, retaining in its treasury the remaining 5,000 shares of its preferred stock, and Kern turned over all this stock so received by him to Frederic R. Coudert, Jr., as alleged trustee for the signers of the underwriting agreement. Under this changed plan there was no provision that the expenses of organization and promotion should be borne by Kern. The result was that the company was left with $500,000 par value of preferred stock and the obligation to pay the expenses of its organization and promotion.

On June 23, 1899, there appeared in the New York newspapers an advertisement. It is entitled: "$3,500,000 7% Cumulative Preferred Stock of the Kern Incandescent Gas Light Co. Share Capital $12,000,000. $1,000,000 7% Cumulative preferred stock, $8,000,000 common stock." Then follows the list of the officers and directors. A letter inserted therein dated June 10, 1899, signed "Kern Incandescent Gas Light Co., by Ernest F. Ayrault, Secretary," addressed to the International Banking and Trust Company, states that the company owns the Kern light, gives statements as to the light, its use, its power, etc., and contains this clause: "The Kern Incandescent Gas Light Co. has been underwritten by leading financial men in New York and elsewhere. By means of such underwriting the Kern Light has been purchased and ample working capital provided." The advertisement proceeds: "$3,500,000 of the 7% cumulative preferred stock is offered for public subscription at par, with a bonus of one share of common stock for every two shares of preferred stock allotted. Subscriptions will be

received by the International Banking and Trust Co., 149 B'way, New York, Produce Exchange Trust Co., 26 B'way, New York, Investment Company of Philadelphia, Beacon Trust Co. of Boston. Certified checks for 25 per cent, payable to the order of International Banking and Trust Company, must accompany each subscription. The balance is payable on allotment to be made within ten (10) days after the close of the subscription. Allotments will be made in order of priority of receipt of the subscription. The right to reduce or reject any subscription is reserved."

Mr. Lorenzo Semple, being called by the plaintiffs, testified: "In April, 1899, when those transactions took place, I was not a member of the firm of Coudert Bros., but I was associated with the firm, and acted in large part for them in this transaction. * * * I made the arrangement for the insertion of the advertisement in the newspapers. * * * The payments as provided by this agreement were made by the various signers thereof to Coudert Bros.— the ten per cent. When Coudert Bros. received that money in their dual capacity of attorney for the Kern Company and attorney for Kern, and by virtue of their agreement [referring to the agreement of May tenth], they paid over the moneys at various times to Ottmar Kern, paying him in all $400,000. * * * I was acting as attorney at this time for the Kern Company. Before Exhibit 2 was inserted in the newspapers I had at least half a dozen interviews with Mr. Harry Keene, who was the president of the company. The substance of the various interviews * * * were [sic] the form in which the advertisement should be issued. * * * Mr. Keene gave this advertisement to me with the request that I should arrange for a newspaper advertising agency * * * and this advertisement was turned over to Mr. Farnham with instructions by Mr. Keene and myself, that it should be put in the various newspapers in which it subsequently did appear. * * * In discussions, Mr. Keene did specifically state to me that he was only interested in the sale of the stock of the Kern Incandescent Gas Light Company, and was not interested in the sale of the stock which was held by Frederic R. Coudert, Jr., as trustee. I stated to him that these two would have to go together — that you couldn't separate them; that the offer

. should be for the $3,500,000 of stock to the public; that $500,000 of that stock applied to the Kern Incandescent Gas Light Company, and the $3,000,000 of the preferred stock was the stock of the signers of Exhibit 1, and that this advertisement was also put into the newspapers upon the distinct agreement between Mr. Keene and myself that the first subscriptions of stock were to be for the account of the Kern Company, and not for the account of the underwriters; and there being $104,000 of stock subscribed, all of the proceeds of that preferred stock so subscribed were allotted to the Kern Company, and the Kern Company thereupon did receive all of the proceeds of that subscription." He also testified: "The preferred stock was issued directly from the company to Mr. Villard as an original issue of stock, the stock at that time being in the treasury of the company. * * * It being unissued stock at that time, he subscribed for the original stock of the company. The common stock was a bonus and supplied to him through the channel of Frederic R. Coudert, as trustee, there being no common treasury stock in the company. * * * The preferred stock which was delivered to Mr. Villard which is here—the certificates of which were offered in evidence—was unissued stock in the treasury of the Kern Incandescent Gas Light Company and was a part of the $500,000 of preferred stock which was reserved in the treasury of the company, the sale of which would produce $500,000 of working capital of the company. * * * The money that Mr. Villard paid for that stock was paid by Mr. Villard to the International Banking & Trust Company. The trust company turned over the money to Coudert Bros. and Coudert Bros. turned it over to the Kern Company."

It further appeared that on March 19, 1900, a committee was appointed to examine into the affairs of the company and that they made a report, stating: "They have come to the following understanding, which they accept for themselves and advise the other underwriters to accept. 1st. The Common Stock is to be reduced from $8,000,000 to $1,000,000; 2nd. The Preferred Stock is to be reduced from $4,000,000 to $1,390,000; 3rd. An issue of 5% ten year Debenture Bonds is to be made to the amount of $1,000,000. Of these securities $390,000 Preferred Stock and $300,000 5% Debenture Bonds will remain

in the Treasury to provide capital to carry on the business. Messrs. Coudert Bros. and C. W. Mayer agree to accept $700,000 5% Debenture Bonds, about $500,000 Preferred Stock and about $800,000 Common Stock in full for all patents. Before your committee was appointed $400,000 in cash was paid for the patents. Under the old plan of $2,750,000 in cash, $750,000 Preferred Stock and $1,500,000 Common Stock were to be given for the patents. This would leave $2,350,000 in cash still due for which we are now paying $2,000,000 in securities. Your Committee have agreed with Messrs. Coudert Bros. and C. W. Mayer that all underwriters who pay 35% of their under-writing shall receive an equal amount of full paid Preferred Stock and a complete release from further obligation."

Thereafter a meeting of the stockholders of the company was held, which authorized the reduction of the capital stock of the company, and the plaintiffs admitted that Henry Villard received notice of the meeting of the stockholders at which this action was taken, and that he did not attend and did not protest; and thereafter each one of the subscribers that paid thirty-five per cent received preferred stock at par for the amount of money that he actually paid in upon exchanging general releases upon both sides, releases from the Kern Company, releases from Ottmar Kern and releases from the signers.

What was the nature of the subscription agreement? Was it an underwriting agreement pure and simple under which the subscribers agreed to take so much of the stock as was not taken by the public, as the referee has held, or was it a down-right subscription whereby the subscribers were themselves to become the owners of the stock? To be sure, it uses the phrase at the beginning "Managing Underwriters." It states the terms of the proposed incorporation and the terms of the con-tract proposed to be made with the inventor. Subscriptions were invited for $3,250,000 of the preferred stock, subscribers to receive two shares of the common stock for each of the preferred, and the subscriptions to become binding when $3,000,000 had been subscribed, ten per cent of subscriptions to be payable to the order of Messrs. Coudert Brothers upon their call, and the balance on ten days' notice by the secretary in writing; "subscriptions will not be accepted unless returned

to Coudert Brothers, * * * who are authorized to arrange for the public subscription to the preferred stock, allowing public subscribers a bonus not to exceed one share of common for each share of preferred; " and the agreement concluded: " We, the undersigned, hereby subscribe for preferred stock at par the amounts opposite our respective names upon the terms and conditions above set forth." ·

It seems clear from that scheme that the $4,000,000 of preferred stock was to be disposed of as follows: Of the $3,250,000 offered for subscription at par, $2,750,000 received from said subscriptions was to be paid in cash to the inventor, the other $500,000 so obtained was to be retained in the treasury in cash for working capital; the $750,000 of preferred stock remaining from the $4,000,000 was to be transferred to the inventor in part payment for his patent. The agreement having disposed of all of the preferred stock of the company, leaving none thereof to be offered at public subscription, it would seem that it was a straight subscription and that the individual subscribers were each liable for the full amount of their subscriptions to the company. If so, then Coudert Brothers became, *first*, the agents of the company to issue the calls and collect the amounts of the subscriptions, and, *secondly*, the agents of the subscribers for the purpose of selling to the public the stock for which they had subscribed and which they owned. For if the subscribers were mere underwriters I see nothing which they could make out of the transaction, while as stock subscribers they would receive two shares of common stock for each share of preferred. If the preferred stock was to be subscribed for by public subscription and taken up the subscribers would not have any preferred stock to which could be attached the two shares of common offered as a bonus. Their profit was to be the difference between the two shares of common which they received for their one of preferred, while the public was to receive not to exceed one share of common for each of preferred.

In the carrying out of the scheme the company issued to Kern $3,500,000 of preferred stock and $8,000,000 of common stock for his patent rights and Kern agreed to and did assign, transfer and deliver to Coudert Brothers, " as representatives of the underwriters to a certain subscription paper " 80,000

shares of common and 35,000 shares of preferred stock upon the agreement that the underwriters should pay $250,000 on or before the 22d day of May, 1899, and $2,500,000 on or before the 15th day of July, 1899; those two sums totaling the $2,750,000 in cash which was to be paid as provided in the original agreement. His claim to the $750,000 in preferred stock was wiped out and there was left 5,000 shares of preferred stock in the treasury of the company.

The paper by which this transaction is evidenced is dated the 10th of May, 1899, and is prior to the date of the subscription of certain of the defendants. So that at the end of these transactions, at the time of the publication of the advertisement asking for subscriptions for $3,500,000 of preferred stock, the situation was that Frederic R. Coudert, Jr., as trustee, held the title to 35,000 shares of which the subscribers had subscribed for 32,600, and 5,000 shares remained unissued in the treasury of the company.

The advertisement was not signed. It contained the letter from the company addressed to the International Banking and Trust Company, which was to receive the public subscriptions, stating that the "Kern Incandescent Gas Light Co. has been underwritten by leading financial men in New York and elsewhere. By means of such underwriting the Kern Light has been purchased and ample working capital provided." By the change above indicated the working capital must be considered to be the $500,000 preferred stock remaining in the treasury instead of the $500,000 in cash contemplated in the original subscription paper, which was to be the difference between the cash received for the face subscription of $3,250,000 and the payment of $2,750,000 to the inventor. So that when this advertisement was published the company did not have $3,500,000 of preferred stock to offer but $3,260,000 was held by Coudert in trust for the subscribers, and so much at least of the amount offered was for their benefit, and the representation must be taken as that of their trustee and agent as well as the representation of the company which signed the letter embodied in the advertisement.

As matter of fact $104,000 which was obtained from the public upon its response to this advertisement was paid or

accounted for through Coudert to the treasury of the company, and for that amount were issued to said public subscribers shares from the hitherto unissued 5,000 preferred shares in the treasury of the company. No portion of said sum, including that paid by Mr. Villard, was received by any one of these defendants. I cannot see how they can be held for money had and received as upon the sale of their stock upon the ground that they were under an implied contract with Villard not to do anything to destroy the value of the thing sold because they subsequently entered into personal agreements with the inventor and the company by which the original contract was canceled, the capital stock of the company was reduced, their obligations upon their subscriptions were cut down and mutual releases interchanged.

The sole bond of union between the defendants was that they were individual and several subscribers to the original subscription paper and that they had created Coudert Brothers their agent for certain purposes in connection with the organization of the company. But there is no allegation here, or proof, of any fraud or misrepresentation, or even knowledge of the various papers and measures taken above alluded to, and the only duty resting upon them under the claim of the plaintiffs is that they should have refrained from doing anything to change the conditions stated to exist in the advertisement. But this claim, even if sound, must be based upon the sale of their property to the plaintiffs' testator and the receipt of his money therefor by them. This claim, however, is unsupported by the evidence. After the purchase by Mr. Villard of the stock in question, each one of the defendants was as much bound by his subscription as he ever had been. None of them had been relieved of a share of stock or had been benefited to the extent of a dollar. The fact is they were subscribers to the stock of a company which did not make a success. To hold a subscriber to the capital stock of an unsuccessful company liable over to a purchaser upon a public subscription, it seems necessary that there should be fraud, misrepresentation or deceit personally brought home to and chargeable upon him. The action proceeds upon no such theory.

The learned referee has found that the stock which Villard

purchased was not the stock of the defendants or any of them, but on the contrary it was part of the unissued stock of the company, and that at the time he purchased such stock Villard had not had any negotiations with the defendants or any one of them, and did not know and had no reasonable cause to believe that the defendants or any one of them had signed a paper in the form set forth, and that none of the defendants made representations of any kind to him. We think those findings are supported by the evidence.

The fact is there were two sources from which funds could be obtained: *First*, from the subscribers to the underwriting agreement, from whom was actually collected $400,000, which, under the terms of the agreement with Kern, was collected by Coudert Brothers and paid over to Kern in part payment for his patents; and, *second*, from public purchasers of the stock, who received treasury stock from the company. The amount so received was $104,000, and this went to the company or was expended for its benefit. Villard's stock was of this class. The amount paid therefor by him did not go to the individuals, was not received by them or any of them, and did not reduce their obligations under their subscriptions.

This being established as a fact, it is difficult to see what privity of contract, from which an obligation can be implied, existed between the underwriters and Villard, no matter what the nature of the underwriters' agreement was, whether a strict underwriting agreement or a direct subscription. The action is concededly one for money had and received. As defendants have not had and did not receive Villard's money, he may not recover it from them. If the original agreement be construed as a subscription paper pure and simple, then the corporation had the right to enforce it, and Villard as a stockholder had the right to institute a representative action to enforce said right in case the corporation did not. But in no event did he have a personal right to recover for his own benefit from said subscribers the amount he had paid to the company for his stock. If they were subscribers pure and simple, and not underwriters, each was severally subscribing and had only an individual obligation to the corporation, and, between themselves and the corporation, were entitled to make

any terms either as stockholders or subscribers as might be mutually agreed upon, subject only to the right of the corporation, or a stockholder in a representative action, to enforce the subscription agreement. But, being no privity, there was no implied contract to subsequent subscribers not to make such mutual agreement as events might prove essential or desirable or as might be consented to. If the defendants did not sell their stock to Villard, the whole fabric of plaintiffs' claim is gone. The learned referee has found that they did not, and said finding is supported by the evidence.

If the agreement be interpreted as an underwriting, then *a fortiori* the decision below was right. In no aspect of the facts as proved and found are plaintiffs entitled to recover.

The judgment appealed from should be affirmed, with costs.

INGRAHAM, P. J., SCOTT, MILLER and DOWLING, JJ., concurred.

Judgment affirmed, with costs.